IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-03123-PAB-KMT

MARTHA SIERRA,

      Plaintiff,

v.

STONEBRIDGE LIFE INSURANCE COMPANY, formerly doing business as J.C.
Penney Life Insurance Company, a Vermont corporation,

      Defendant.

---

## ORDER

---

    This matter is before the Court on the Motion for Summary Judgment [Docket

No. 54] filed by defendant Stonebridge Life Insurance Company ("Stonebridge").  The

Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

## I.  BACKGROUND[1]

    This case arises out of an insurance coverage dispute between Stonebridge and

plaintiff Martha Sierra.  Stonebridge is a company that sells life insurance policies and,

in 2007, Stonebridge had a contract with Americall Group, Inc., ("Americall") a third

party teleservices firm, to sell life insurance policies over the telephone.  Docket No. 54-

3 at 1, ¶¶ 6-7; Docket No. 69-4 at 3.  Pursuant to the contract, Americall representatives

would solicit prospective customers and market Stonebridge's life insurance policies.

Docket No. 54-3 at 1, ¶¶ 6-7.  If a customer contacted by Americall expressed an

---

[1]The following facts are undisputed unless otherwise indicated.

interest in purchasing an insurance policy, the Americall representative would transfer

the customer to a licensed insurance agent who would complete the sale.  *Id*.  As part

of this sales process, Stonebridge preserved audio recordings of conversations

between licensed insurance agents and potential customers; however, Stonebridge did

not record or retain conversations between prospective customers and Americall

representatives.  *Id*.; Docket No. 69-4 at 4.

On July 2, 2007, Ms. Sierra received a phone call from Arelis Lopez, an

Americall representative, regarding Stonebridge life insurance policies.  Docket No. 69-

4 at 2-3.  Once Ms. Sierra expressed interest in purchasing an insurance policy, Ms.

Lopez transferred Ms. Sierra to Sandra Arguello, a licensed Stonebridge insurance

agent.  Docket No. 54-4 at 4 (0574).  Ms. Sierra and Ms. Arguello spoke in Spanish.[2]

During the conversation with Ms. Arguello, Ms. Sierra agreed to enroll in a Graded

Benefit Life Insurance plan.  The terms of the life insurance policy as reflected by the

transcript of the conversation provided for $12,739.00 in insurance benefits, as well as

additional coverage "for accidental death at a value of $12,739.00."  Docket No. 54-4 at

4 (0574).  The Graded Benefit Life Insurance plan required monthly premium payments

of $24.95, which were due three months after the policy went into effect.  *Id*. at 5-6

(0575-0576).  Ms. Arguello also told Ms. Sierra that the Graded Benefit Life Insurance

_____

[2]Stonebridge submitted an audio CD with recordings of the telephone calls
between Ms. Sierra and licensed insurance agents.  Docket No. 108.  Stonebridge also
provided both a Spanish transcript, Docket No. 54-12, and an English transcript of the
July 2, 2007 conversation between Ms. Sierra and Ms. Arguello.  Docket No. 54-4 at 4-
7 (0574-0577).  Ms. Sierra stipulated that the Spanish transcript was an accurate
representation of her conversation with Ms. Arguello on July 2, 2007.  Docket No. 54-5
at 9 (Sierra Dep. 62:3-22).

policy provided "limited benefits for death due to natural causes during the first two years of coverage" and that, during the policy's first year, it provided "for non accidental death" coverage up to "125% of the first year's premium" and, during the second year, the policy provided coverage in the amount of "125% of the premiums of the first two years."[3]  *Id.* at 4 (0574).  In her deposition, Ms. Sierra testified that Ms. Arguello described all of these terms during the July 2, 2007 phone call.  Docket No. 54-5 at 9-10 (Sierra Dep. 64:11-65:3).  Once Ms. Sierra agreed to the terms of the policy, Docket No. 54-4 at 6 (0576), Stonebridge enrolled her in a Graded Benefit Life Insurance plan issued under Certificate No. 74L9067673 with an effective date of July 2, 2007.  *See* Docket No. 54-7.

Ms. Sierra disputes several of these facts.  First, she claims that Stonebridge's July 2, 2007 audio recording is incomplete because it does not include Ms. Sierra's conversation with Ms. Lopez or her entire conversation with Ms. Arguello.  Docket No. 69 at 12-13.  Ms. Sierra claims that, during the July 2, 2007 phone conversation, a Stonebridge representative told Ms. Sierra that she was eligible to purchase two $100,000.00 life insurance policies from Stonebridge – one for her husband, Isaias Sierra, and the other one for herself – with monthly premiums of $24.95 each.  Docket No. 69-2 at 2 (Sierra Dep. 68:9-12); *id.* at 3 (Sierra Dep. 69:1-12).  Ms. Sierra also testified that a "supervisor" confirmed that Ms. Sierra purchased a $100,000.00 life insurance policy on July 2, 2007.  *Id.* at 4 (Sierra Dep. 70:8-12).  In addition, Ms. Sierra

---

[3]According to these terms, the beneficiaries of the Graded Benefit Life Insurance plan would receive $390.00 if the insured died of natural causes within the first year of the policy and $780.00 if the insured died of natural causes during the second year of the policy.  Docket No. 54-7 at 3.

disputes that Stonebridge sent her a copy of the life insurance policy issued under

Certificate No. 74L9067673 and testified that she never received a copy of the July 2,

2007 Graded Benefit Life Insurance policy.[4]   Docket No. 54-11 at 5 (Sierra Dep. 18:9-

18).

On August 2, 2007, a Stonebridge representative contacted Ms. Sierra about

additional life insurance policies.  Although Ms. Sierra spoke with a female

representative on the morning of August 2, 2007,[5] the terms of the August 2, 2007

insurance policy were not finalized until later that same day when Ms. Sierra spoke with

---

[4]Stonebridge provides an affidavit from Ben Bennett, telemarketing and fulfillment manager for Transamerica Life Insurance Company, in which he states that, according to Stonebridge's business records, on July 9, 2007, Stonebridge sent Ms. Sierra a copy of the Graded Benefit Life Insurance policy issued under Certificate No. 74L9067673.  Docket No. 54-6 at 1, ¶ 7.  However, Mr. Bennett is not Stonebridge's or even Transamerica Life Insurance Company's custodian of records and has no personal knowledge of the procedures that were in place for mailing letters in 2007 since he began working for Transamerica in 2011.  *Cf. Boomer v. AT & T Corp.*, 309 F.3d 404, 415 n.5 (7th Cir. 2002) ("In this case, AT & T presented proof through the Declaration of Ellen Reid, the AT & T employee who oversaw the mailing of the [consumer service agreement] to AT & T customers, verifying that proper mailing procedures were followed.  Boomer does not present any conflicting evidence in this regard. Thus, we must presume that Boomer received the mailing.").  In addition, Mr. Bennett does not have personal knowledge of whether Stonebridge's usual procedures were actually followed in 2007 when it allegedly sent Ms. Sierra the certificate of insurance.  Docket No. 54-6 at 1, ¶¶ 10-11.  Given that Mr. Bennett does not have personal knowledge of the circumstances surrounding the mailing of Ms. Sierra's certificate, Mr. Bennett's testimony does not rebut Ms. Sierra's claim that she did not receive the certificate.  *See Anderson v. Credit Bureau Collection Servs.*, 422 F. App'x 534, 538 (7th Cir. 2011) (finding affidavit from company director about procedures of third-party vendor were inadmissible hearsay because director was not custodian of the records, had no personal knowledge of third-party vendor procedures, and did not have knowledge of whether these procedures were followed in the particular instance).

[5]It is unclear from the record whether Ms. Sierra spoke with an Americall representative or a licensed insurance agent on the morning of August 2, 2007.  *See* Docket No. 69-1 at 14.

Bobbi Acosta, a licensed Stonebridge insurance agent.  Docket No. 69-1 at 13.  During

Ms. Sierra's conversation with Ms. Acosta, Ms. Sierra agreed to enroll her family in

Stonebridge's "group insurance plan for accidental death and hospital confinement."  *Id*.

Although the transcript of the conversation between Ms. Sierra and Ms. Acosta does

not include the policy limits for this plan, the transcript shows that the policy Ms. Sierra

purchased on August 2, 2007 provided coverage for accidental death and extended

hospital stays and required monthly premium payments of $21.95, which were due two

months after the policy went into effect.  *Id*.

Ms. Sierra disputes Stonebridge's characterization of the insurance policy she

purchased on August 2, 2007.  Ms. Sierra argues that the August 2, 2007 phone call is

a continuation of the July 2, 2007 phone call during which she purchased a

$100,000.00 life insurance policy for her husband.  Docket No. 69 at 12.  Ms. Sierra

claims that she discussed the $100,000.00 life insurance policy with a female

representative on the morning of August 2, 2007 and believed that her conversation

with Ms. Acosta was to finalize the terms of that policy.  Docket No. 69 at 9-10; Docket

No. 69-1 at 14.

On January 15, 2008, an Americall representative contacted Ms. Sierra again

about additional life insurance policies.  Once Ms. Sierra expressed interest in

purchasing an insurance policy, she spoke with Hans Ohrner, a licensed Stonebridge

insurance agent, to finalize the purchase of a life insurance policy.  Docket No. 54-4 at

8 (0578).  Ms. Sierra and Mr. Ohrner spoke in Spanish during the phone call.[6]  During

---

[6]Ms. Sierra admitted that she recognized her voice "in different places" during the
January 15, 2008 audio recording.  Docket No. 54-10 at 7 (Sierra Dep. 83:23-25).

this conversation, Mr. Ohrner described the terms of a Graded Benefit Life Insurance plan that provided the insured with $11,683.00 in life insurance benefits.  *Id*.  The Graded Benefit Life Insurance plan required monthly premium payments of $24.95, which were due three months after Ms. Sierra agreed to its terms.  *Id*. at 10 (0580). The January 15, 2008 policy provided "for non accidental death" coverage up to "125% of the premium paid during the first year" and, during the second year, the policy provided coverage in the amount of "125% of the premiums paid during the first years."[7] *Id*. at 9 (0579).  Once Ms. Sierra agreed to the terms of this policy, *id*. at 10 (0580), Stonebridge enrolled Ms. Sierra in a Graded Benefit Life Insurance plan issued under Certificate No. 74L92F9930 with an effective date of January 15, 2008.  *See* Docket No. 54-9.

Ms. Sierra disputes Stonebridge's representation of the terms of the life insurance policy purchased on January 15, 2008.  Docket No. 69 at 13-14.  Ms. Sierra testified that the January 15, 2008 phone call did not actually occur.  Docket No. 54-5 at 3-4 (Sierra Dep. 24:24-25-18).  In addition, Ms. Sierra testified that she did not receive a copy of the January 15, 2008 policy.  Docket No. 54-11 at 3-4 (Sierra Dep. 12:23-13:20); *id*. at 5 (Sierra Dep. 18:9-18).

On May 22, 2009, Ms. Sierra's husband died of natural causes.  Docket No. 54-5 at 2-3 (Sierra Dep. 20:13-21:8); Docket No. 54-2.  Ms. Sierra filed a claim with Stonebridge for $100,000.00 in life insurance benefits pursuant to the policies issued

---

[7]According to these terms of the policy, the beneficiaries of the Graded Benefit Life Insurance plan would receive $390.00 if the insured died of natural causes within the first year of the policy and $780.00 if the insured died of natural causes during the second year of the policy.  Docket No. 54-9 at 3.

under Certificate Nos. 74L92F9930 and 74L9067073.  Docket No. 1-1 at 6, ¶¶ 24-25.

Stonebridge denied Ms. Sierra's claim.  On August 21, 2009, Ms. Sierra and Olivia

Sanchez, Ms. Sierra's niece, filed a complaint against Stonebridge with the Colorado

Division of Insurance.  Docket No. 54-20.  In the Colorado Division of Insurance

complaint, Ms. Sierra claimed that she had purchased four policies from Stonebridge

under certificate numbers: (1) 74A90H6739; (2) 74AG6P1417; (3) 74L907673;[8] and (4)

74I92F9930.  *Id*. at 1.  Ms. Sierra alleged that the policies under Certificate Nos.

74L92F9930 and 74L9067673 provided her and her husband with life insurance

policies in the amount of $100,000.00.  *Id*.  After an investigation, the Colorado Division

of Insurance dismissed Ms. Sierra's complaint.  Docket No. 54-15 at 8 (Sanchez Dep.

49:8-12).

     As a result of these events, on November 19, 2010, Ms. Sierra filed a complaint

in the District Court for the City and County of Denver, Colorado.  Docket No. 1-1 at 4-8.

In her complaint, Ms. Sierra brings claims against Stonebridge for violations of the

Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-101 *et seq*., and

for breach of contract.  Docket No. 1-1 at 6-8.  On December 22, 2010, Stonebridge

removed the case to this Court asserting that this Court had diversity jurisdiction

pursuant to 28 U.S.C. § 1332.  Docket No. 1.

---

[8]In the Division of Insurance complaint, Ms. Sierra identifies a policy with a certificate number ending in a "63," *see* Docket No. 54-20 (listing Certificate No. 74L906763), while Stonebridge's insurance policy lists a certificate number ending in "73."  *See* Docket No. 54-7 at 1 (listing Certificate No. 74L9067673).  The discrepancy between the two certificate numbers appears to be a typographical error.

While the case was pending, on June 2, 2011, Ms. Sanchez called Stonebridge to obtain information about Ms. Sierra's insurance policies. Docket No. 54-15 at 2 (Sanchez Dep. 18:22-19:10). During the June 2, 2011 phone call, Russell Johnson, a Stonebridge representative, told Ms. Sanchez that Ms. Sierra had four insurance policies with Stonebridge and identified the insurance policies pursuant to the certificate numbers and the monthly premium payments. *See* Docket No. 54-17; Docket No. 54-5 at 4 (Sierra Dep. 25:10-16); Docket No. 69-4 at 2-3. According to Mr. Johnson, Ms. Sierra's first policy was an accidental death and dismemberment policy issued under certificate number 74A90H6739 that provided coverage up to $1,000,000.00 for accidents involving common carriers, $200,000.00 for motor vehicle accidents, and $90,000.00 for other accidents, such as drowning, choking, random acts of violence, and natural disasters. Docket No. 54-17 at 2-3. Ms. Sierra made monthly payments of $21.95 for the accidental death and dismemberment policy. *Id*. Ms. Sierra's second policy was a $12,739.00 life insurance policy issued under certificate number 74L9067673, for which Ms. Sierra made monthly premium payments of $24.95. *Id*. Ms. Sierra's third policy was an $11,683.00 life insurance policy issued under certificate number 74L92F9930, for which Ms. Sierra made monthly payments of $24.95. *Id*. Ms. Sierra's fourth insurance policy with Stonebridge was a disability policy issued under certificate number 59AN5B7163 that covered Ms. Sierra's entire family, for which she paid $15.90 per month. *Id*.

On June 7, 2012, Stonebridge filed the present motion requesting that the Court enter summary judgment in its favor and against Ms. Sierra on all of her claims. In

addition, Stonebridge requests an award of fees and costs pursuant to Colo. Rev. Stat.

§ 6-1-113(3).  Docket No. 54 at 18-19.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if

under the relevant substantive law it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary

judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An

issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997).

## III.  ANALYSIS

### A.  Colorado Consumer Protection Act

In her complaint, Ms. Sierra alleges that Stonebridge violated the CCPA because

it engaged in a deceptive trade practice and that Ms. Sierra has suffered damages as a

result of Stonebridge's conduct.  Docket No. 1-1 at 7, ¶¶ 33-34.  Although Ms. Sierra

raises a CCPA claim in the complaint, Ms. Sierra states in the Final Pretrial Order

[Docket No. 103], that she "is no longer asserting [her CCPA claim] because she was

unable to discover how Defendant's alleged unfair and/or deceptive trade practice

significantly impacts the public." Docket No. 103 at 2. Stonebridge objects to the

dismissal of Ms. Sierra's CCPA claim, alleging that it has incurred expenses in

defending the CCPA claim and that it will be prejudiced if the Court dismisses the claim

because it will not have the opportunity to secure attorneys' fees and costs pursuant to

Colo. Rev. Stat. §§ 6-1-113 and 13-17-102. *Id*.

In its motion for summary judgment, Stonebridge specifically argued that Ms.

Sierra could not support her CCPA claim because she could not show that the alleged

deceptive trade practice had a significant public impact. Docket No. 54 at 18. In

response to Stonebridge's motion for summary judgment, Ms. Sierra did not address

whether she could establish that Stonebridge's alleged deceptive trade practice had a

significant public impact. Thus, although Ms. Sierra was aware as early as October 17,

2012 – the day she filed her response to the summary judgment motion – that she

would be unlikely to support her CCPA claim, Ms. Sierra did not file a motion to amend

her complaint[9] or a motion to otherwise dismiss the CCPA claim from the case.

Accordingly, although the pretrial order is the controlling document for trial, *see Wilson

v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002), the Court will consider Stonebridge's

____

[9]The deadline for amending pleadings was April 1, 2011. Docket No. 25 at 7. Because Stonebridge has filed a responsive pleading, Docket No. 10, Ms. Sierra can only amend her complaint with leave from the Court. Fed. R. Civ. P. 15(a)(2). Even assuming Ms. Sierra had moved to amend her complaint, the Court would have denied such an amendment because Ms. Sierra has provided no explanation for her delay in dismissing her CCPA claim. *See Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (noting that denial of leave to amend is proper where there is "undue delay," and the party filing the motion has "no adequate explanation for the delay"). Moreover, the Court finds that, for substantially the same reasons, Ms. Sierra would not have satisfied Rule 16's "good cause" standard for amending the scheduling order. *United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1166 (10th Cir. 2009).

motion for summary judgment against Ms. Sierra's CCPA claim on the merits because the Court finds that Stonebridge will otherwise be prejudiced.

### 1. CCPA Claim

"To prove a private cause of action under the CCPA, a plaintiff must show: (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business . . .; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003).  If all elements of a CCPA claim are not met, the claim fails as a matter of law. *HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011).

In addition to establishing a deceptive trade practice, a plaintiff asserting a CCPA claim must present evidence proving that "the defendant's challenged practice significantly impacts the public."  *Rhino Linings*, 62 P.3d at 149.  Considerations relevant to whether a challenged practice significantly impacts the public include: "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future."  *Id*.

11

Ms. Sierra has provided no evidence showing that Stonebridge's alleged deceptive trade practice has had a significant public impact, such as the number of consumers affected by Stonebridge's alleged deceptive practice, the relative bargaining power of these consumers, or how the challenged practice has the potential to impact a significant number of customers in the future.  *Rhino Linings*, 62 P.3d at 149. Accordingly, because Ms. Sierra has failed to present any evidence in support of the significant public impact element, the Court finds that Stonebridge is entitled to summary judgment on her CCPA claim.  *HealthONE*, 805 F. Supp. 2d at 1120.

### 2.   *Colo. Rev. Stat. § 6-1-113(3)*

Stonebridge requests an award of attorneys' fees pursuant to Colo. Rev. Stat. § 6-1-113(3), arguing that Ms. Sierra's CCPA claim is facially groundless and that Ms. Sierra brought her claim in bad faith or for the purpose of harassment.  Docket No. 54 at 18.

Section 6-1-113(3) provides that "[a]ny person who brings an action under th[e CCPA] that is found by the court to be groundless and in bad faith or for the purpose of harassment shall be liable to the defendant for the costs of the action together with reasonable attorney fees as determined by the court."  Colo. Rev. Stat. § 6-1-113(3); *see U.S. Fax Law Center, Inc. v. Henry Schein, Inc.*, 205 P.3d 512, 518 (Colo. App. 2009).  Thus, to recover under the statute, Stonebridge must show both that the claim was groundless and that it was either brought in bad faith or for the purpose of harassment.

12

Under Colorado law a claim or defense is "'groundless' if the proponent has a valid legal theory, but can offer little or no evidence to support the claim." *Wheeler v. T.L. Roofing, Inc.*, 74 P.3d 499, 505 (Colo. App. 2003).  In this case, Ms. Sierra has presented no evidence showing that Stonebridge engaged in a deceptive trade practice.  Ms. Sierra's only argument on this score is that Stonebridge's failure to "honor an agreement to provide insurance . . . could constitute a deceptive trade practice." Docket No. 69 at 17.  Even assuming that a failure to perform under a contract could qualify as a deceptive practice, Ms. Sierra has made no showing in her complaint or her response to the motion for summary judgment that Stonebridge's alleged deceptive trade practice had a significant public impact.  Given Ms. Sierra's failure to provide any evidence on a key element of her CCPA claim, the Court finds that Ms. Sierra's CCPA claim is groundless.

However, the Court finds that Stonebridge has not shown that Ms. Sierra brought her CCPA claim in bad faith or for the purpose of harassment.  Although the Court has found that the claim is groundless, this fact alone does not establish bad faith or harassment.  Because Stonebridge has not shown that Ms. Sierra acted in bad faith or for the purpose of harassment, the Court finds that Stonebridge is not entitled to attorneys' fees pursuant to Colo. Rev. Stat. § 6-1-113(3).  *Henry Schein*, 205 P.3d at 518.

### B.   Breach of Contract

Ms. Sierra claims that she purchased two $100,000.00 life insurance policies from Stonebridge through either her July 2, 2007 or August 2, 2007 phone

conversations with Stonebridge representatives.  Docket No. 69 at 17-18.  In response, Stonebridge argues that Ms. Sierra did not purchase two $100,000.00 life insurance policies, but rather purchased two life insurance policies with coverage amounts of $12,739.00 and $11,683.00 respectively, as well as an accidental death and hospital confinement insurance policy.  Docket No. 54 at 13; Docket No. 78 at 12.  In the alternative, Stonebridge contends that the terms of Ms. Sierra's alleged contracts are too vague and indefinite to constitute enforceable contracts.  Docket No. 54 at 13.

Generally, a federal court sitting in diversity applies the substantive law of the forum state.[10]  *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 683 (10th Cir. 2007).  Under Colorado law, to prove a breach of contract claim, a plaintiff must establish the following elements: (1) the existence of a contract; (2) plaintiff's performance or some justification for nonperformance; (3) defendant's failure to perform; and (4) resulting damages to the plaintiff.  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).  Here, it is undisputed that Ms. Sierra made all of the required insurance premium payments for all of her insurance policies and that Stonebridge refused to pay Ms. Sierra's insurance claim.  The issue centers around the first element of a breach of contract claim: the existence of a contract.

Under Colorado law, a contract is formed "when one party makes an offer and the other accepts it, and the agreement is supported by consideration."  *Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 133 (Colo. App. 2009); *Indus. Prods. Int'l, Inc. v. Emo Trans, Inc.*, 962 P.2d 983, 988 (Colo. App. 1997) (noting that an

---

[10]Both parties assume that Colorado law applies to the instant case, and the Court finds no reason to apply the law of another state.

enforceable contract requires mutual assent between competent parties to exchange

certain subject matter for legal consideration).  Acceptance is defined as words or

conduct that, when objectively viewed, manifests an intent to accept essential elements

of the agreement.  *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008); *Scoular*

*Co. v. Denney*, 151 P.3d 615, 619 (Colo. App. 2006).

To create an enforceable contract, the terms of the offer must be sufficiently

definite such that the promises and performances required of each party are reasonably

certain.  *Watson v. Public Service Co.*, 207 P.3d 860, 868 (Colo. App. 2008); *N.Y. Life*

*Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996) (noting that, to be

enforceable, a contract must appear as though further negotiations are not required to

work out important and essential terms); *Federal Lumber Co. v. Wheeler*, 643 P.2d 31,

36 (Colo. 1981).  If the parties agree as to some issues, but fail to reach a meeting of

the minds as to other material issues, the contract is not sufficiently formed.

*DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Colo. App. 2001).

However, the "mere intention to reduce an oral or informal agreement to writing, or to a

more formal writing, is not of itself sufficient to show that the parties intended that until

such formal writing was executed the parol or informal contract should be without

binding force."  *Coulter v. Anderson*, 357 P.2d 76, 80 (Colo. 1960).  To determine

whether a term is "essential" or "material" such that there is a meeting of the minds by

the parties about that term's requirements, or whether the term is inessential to

questions of contract formation is a matter that must be "determined from the intention

of the parties as disclosed upon consideration of all surrounding facts and

circumstances." *Am. Min. Co. v. Himrod-Kimball Mines Co.*, 235 P.2d 804, 807 (Colo.

1951); *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 n.6 (Colo. 1986)

(noting that the rules applicable to a determination of whether a contract exists are

different from those applicable to contract interpretation cases).  When the existence of

a contract is at issue and the evidence is in conflict or admits to more than one

inference or conclusion, then it is for the trier of fact to decide whether a contract exists.

*I.M.A.,* 713 P.2d at 887.

### 1.   July 2, 2007 Phone Call

With regard to the July 2, 2007 phone call, Ms. Sierra claims that, after speaking

with a Stonebridge supervisor,[11] she purchased a $100,000.00 life insurance policy for

her husband.  Docket No. 62-2 at 4 (Sierra Dep. 70: 8-13).  In response, Stonebridge

asserts that, after the July 2, 2007 phone call, Ms. Sierra only purchased a $12,739.00

life insurance policy.  Stonebridge raises several arguments in support of this

proposition.

First, Stonebridge claims that the transcript and the audio recording of the July 2,

2007 conversation clearly establish the policy limits and the terms of the life insurance

policy Ms. Sierra purchased that day.  Docket No. 54 at 12-13.  In addition, Stonebridge

argues that George Papcun, a forensic consultant, demonstrated that the July 2, 2007

audio recording is a complete and unaltered account of Ms. Sierra's conversation with

Ms. Arguello.  *Id*.  Stonebridge claims that, because there is no dispute about the

---

[11]Viewing the evidence in a light most favorable to Ms. Sierra, the Court finds
that a jury could reasonably find that Ms. Sierra's reference to a "supervisor" refers to a
licensed insurance agent, namely, Ms. Arguello.

content of the July 2, 2007 phone call, there are no genuine disputes of fact about the terms of the contract. The Court disagrees.

Ms. Sierra does not argue that Stonebridge altered or otherwise manipulated the recordings it provided. Instead, Ms. Sierra argues that the July 2, 2007 recording is incomplete because it omits an essential part of her conversation with Ms. Arguello, namely, the part of the conversation where Ms. Arguello said that Ms. Sierra could purchase a $100,000.00 life insurance policy for her husband. Docket No. 69-2 at 4 (Sierra Dep. 70:8-13). Because Ms. Sierra testified that Ms. Arguello or the "supervisor" told her this information before Stonebridge recorded the conversation, this testimony is enough to raise a genuine issue of disputed facts with regard to whether Ms. Arguello did in fact make this representation on July 2, 2007.[12]  *See Berry v. Chicago Transit Authority*, 618 F.3d 688, 691 (7th Cir. 2010) (noting that uncorroborated testimony from the non-movant is sufficient to raise a triable issue of fact). Thus, although Stonebridge's recording of the July 2, 2007 conversation may provide an accurate account of the conversation between Ms. Sierra and Ms. Arguello, this fact alone does not rebut Ms. Sierra's claim that the July 2, 2007 recording started *after* Ms. Arguello told Ms. Sierra that she could purchase a $100,000.00 life insurance policy for her

---

[12]The transcript of the July 2, 2007 phone call begins with Ms. Arguello introducing herself to Ms. Sierra, which suggests that Ms. Arguello and plaintiff did not have a conversation before the recording began. Docket No. 54-4 at 4. However, viewing this evidence in a light most favorable to plaintiff, the Court finds that whether Stonebridge's recording represents the entire conversation is a question of fact for the jury. *See Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010).

husband.[13]  *See Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (noting that,

when video evidence does "not capture everything . . ., in addition to relying on the

video," a court must "also continue to view the evidence in the light most favorable to

[the non-moving party]").  As such, Ms. Sierra's testimony is relevant to the question of

whether it was reasonable for Ms. Sierra to rely on Ms. Arguello's representation that

Ms. Sierra was purchasing a $100,000.00 life insurance policy for her husband, despite

the fact that the concluding portion of the July 2, 2007 phone conversation appears to

recite different insurance policy terms.  Whether this evidence is ultimately sufficient to

establish the existence of a contract is a question of fact for the jury to decide.  *I.M.A.,*

713 P.2d at 887; *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing

of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge, whether he is ruling on a motion for summary judgment

or for a directed verdict").

Second, Stonebridge argues that any unrecorded conversation Ms. Sierra had

with a Stonebridge representative on July 2, 2007 constitutes a pre-agreement

negotiation and is insufficient to establish the existence of a binding insurance contract.

Docket No. 54 at 15.  Stonebridge claims that any conversation Ms. Sierra had with a

Stonebridge representative that was not recorded cannot establish an agreement of

---

[13]Stonebridge acknowledges that it does not record all of the conversations between potential customers and Americall representatives and that the audio recording of the July 2, 2007 conversation began only after the recording device was activated.  Docket No. 54-3 at 1, ¶¶ 5-6.  Stonebridge, however, does not explain how its audio recording mechanism works, such as whether a licensed agent can delay activating the recording device or whether the conversations between licensed agents and potential customers are automatically recorded.

essential terms because Ms. Sierra's account of the July 2, 2007 phone call is too vague and indefinite to create an enforceable contract. *Id*.

As noted above, to establish the existence of a contract, the parties must understand and agree to all essential terms of the contract. *DiFrancesco*, 39 P.3d at 1248. The parties' agreement upon the essential terms of the contract is "evidenced by their manifestation of mutual assent." *I.M.A.*, 713 P.2d at 888. Like an express insurance contract, an oral insurance contract "must specify the subject matter to be insured, the scope of the risk to be insured, the duration of the risk, the amount of the indemnity and the amount of the premium." 1 Jeffrey Thomas & Francis J. Mootz, III, *New Appleman on Insurance Law* § 3:02 (2013); *accord Fin. Resources Network, Inc. v. Brown & Brown, Inc.*, --- F. Supp. 2d ----, 2013 WL 1010632, at *14 (D. Mass. March 14, 2013); *see also Zannini v. Reliance Ins. Co. of Ill., Inc.*, 590 N.E. 2d 457, 464 (Ill. 1992) (applying Illinois law).

In this case, Stonebridge does not dispute that oral contracts of insurance are enforceable. *See Commonwealth Cas. Ins. Co. v. Kuhrt*, 225 P. 251, 252 (Colo. 1924) (noting that oral contracts of insurance may be enforceable). Rather, Stonebridge argues that Ms. Sierra does not demonstrate that her unrecorded conversation with Ms. Arguello established an agreement of the following essential terms: subject matter, risk, the term or length of the insurance contract, and the need for a medical exam. Docket No. 54 at 14-15. The Court disagrees.

With regard to the subject matter, Ms. Sierra testified that she purchased the $100,000.00 policy to cover her husband's life. Docket No. 54-11 at 2 (Sierra Dep.

7:12-13).  As to risk, Ms. Sierra testified that the policy she purchased would provide $100,000.00 in coverage upon her husband's death whereby Stonebridge would pay for the costs of the funeral expenses and Ms. Sierra would receive the remainder of the benefits.  *Id*. at 3 (Sierra Dep. 10:6-10).  To the extent Stonebridge claims this term is vague, Docket No. 54 at 14, the Court finds that a jury could reasonably find that an agreement on this term is not vague.  *Anderson*, 477 U.S. at 255.  Next, Stonebridge claims that there is no agreement about the duration of the coverage; however, the transcripts Stonebridge provides of the conversations involving its licensed agents, which Stonebridge agrees create valid oral contracts for insurance, do not mention the duration of the coverage purchased.  *See* Docket No. 54-4 at 4-6, 8-10.  Hence, based on Stonebridge's own evidence, it appears that in some circumstances the duration of a policy is not an essential term of a life insurance contract.[14]  *See, e.g., Devers v. Prudential Prop. & Cas. Ins. Co.*, 408 N.E. 2d 462, 464 (Ill. App. 1980) (noting that an oral contract to insure may be inferred even in the absence of an agreement on duration based on prior dealings between the parties or custom and practice) (applying Illinois law).  Given that Stonebridge's licensed agents do not always mention the duration of the life insurance policies they sell, Stonebridge's argument about Ms. Sierra's failure to identify the duration of the insurance policy she bought for her husband is not detrimental to her claim on summary judgment.

---

[14]Stonebridge could be arguing that the contract Ms. Sierra claims she purchased is of a different type than the contract represented in the transcripts of the phone calls.  Assuming this is its argument, Stonebridge does not describe the various types of life insurance contracts an insured may purchase and why the essential terms of these contracts may vary based on the type of life insurance purchased.

In addition, Stonebridge argues that Ms. Sierra does not testify about the need for a medical exam.  Docket No. 54 at 15.  However, Stonebridge cites to no caselaw in support of the proposition that a medical exam is an essential term of a life insurance policy.  A medical exam can be a condition precedent to a life insurance contract; however, there is no evidence that this is the case here.  *See, e.g., Wise v. Am. Gen. Life Ins. Co.*, 459 F.3d 443, 447 (3d Cir. 2006) (applying Pennsylvania law and finding that an insurer can insert a "good health" clause as a condition precedent in a life insurance policy).  Thus, although Stonebridge argues that it is "fanciful" for Ms. Sierra to assert that she purchased a $100,000.00 policy without a medical exam, Docket No. 54 at 15, Stonebridge provides no support for the proposition that an increase in the amount of coverage necessarily adds an additional essential term to a life insurance contract, namely, the need for a medical examination.[15]  Because Ms. Sierra has identified at least four essential terms – risk, subject matter, scope of risk, and the premium paid – the Court finds that there are genuine disputes of material fact about whether her alleged unrecorded conversation with Ms. Arguello sufficiently demonstrates an agreement about essential terms.  *I.M.A.*, 713 P.2d at 887-88; *Himrod-Kimball*, 235 P.2d at 807.[16]

---

[15]To the extent Stonebridge claims that it does not sell $100,000.00 life insurance policies without a medical examination, this claim is disputed.  Ms. Sanchez testified that a Stonebridge representative told her in 2009 that Ms. Sierra had purchased two $100,000.00 life insurance policies with Ms. Sierra listed as the insured and there is no indication that Ms. Sierra was ever subject to a medical examination.  Docket No. 69-3 at 3 (Sanchez Dep. 11:5-9).

[16]Stonebridge's arguments regarding merger and novation are inappropriate for resolution at the summary judgment stage.  Docket No. 54 at 16.  With regard to merger, this argument is again a query into whether the parties had a meeting of the

Third, Stonebridge argues that Ms. Sierra cannot establish the existence of a $100,000.00 life insurance policy based on statements made by Stonebridge representatives because these statements are belied by the express terms of the insurance policy.  Docket No. 78 at 15.  Stonebridge also asserts that Ms. Sierra should have known that Stonebridge's agents could not alter the terms of an insurance policy because Ms. Sierra's 1998 policy had language similar to that of the 2007 insurance policy.  *Compare* Docket No. 85-2 at 6 (0032) (noting that "[n]o agent may change or waive any provisions of the Policy under which this coverage is provided") *with* Docket No. 54-7 at 5 (noting the same).

Statements made by an agent within the scope of his or her actual or apparent authority are binding on the principal regardless of whether the principal has actual knowledge of the agent's statements.  *Life Investors Ins. Co. v. Smith,* 833 P.2d 864, 868 (Colo. App. 1992).  However, if an insured has a copy of her insurance policy, an agent's oral misrepresentation which contradicts the express terms of the policy will not be imputed to the insurance company.  *Branscum v. Am. Cmty. Mut. Ins. Co.*, 984 P.2d

---

minds or whether Ms. Arguello and Ms. Sierra's pre-recorded conversation was merely an "agreement to agree" which would be finalized by the recorded conversation.  Given the substantial overlap between the issues of merger and contract formation, whether there was a merger is an issue of fact for the jury to decide.  With regard to novation, because the issue of whether Ms. Arguello's unrecorded statements to Ms. Sierra constitute a contract is necessarily antecedent to whether there was a novation, the Court finds that it is not appropriate to consider arguments regarding a novation before the factual dispute surrounding the existence of a valid contract is resolved.  *See Phoenix Power Partners v. Colo. Public Utilities Comm'n*, 952 P.2d 359, 364 (Colo. 1998) (explaining a novation); *Moffat Cnty. State Bank v. Told*, 800 P.2d 1320, 1323 (Colo. 1990) (noting that whether there has been a novation is ordinarily a question of fact).

675, 680 (1999).  This is because the insured, under these circumstances, is presumed

to have knowledge of the restrictions stated in the policy.  *Id*.

In this case, there is no evidence in the record regarding whether Ms. Lopez or

Ms. Arguello had actual authority to bind Stonebridge to the terms of an insurance

contract.  *See Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo. 1994) (noting that express

or actual authority exists whenever the principal directly states that its agent has

authority to perform a particular act on the principal's behalf).  However, Stonebridge

does not argue that Ms. Lopez and Ms. Arguello did not have apparent authority to bind

it to an insurance contract.  *See Lucero v. Goldberger*, 804 P.2d 206, 209 (Colo. App.

1990) (apparent authority is "created by written or spoken words or other conduct of the

*principal* which, reasonably interpreted, causes a person to believe that the principal

consents to have the act done on his behalf by a person purporting to act for him")

(emphasis in original).  Moreover, Stonebridge does not argue that Ms. Sierra was told,

at any time during the July 2, 2007 phone call, that Ms. Arguello did not have the

authority to bind Stonebridge to the oral terms of the insurance policy.  *See Myers v.*

*Alliance for Affordable Servs.*, 371 F. App'x 950, 956 (10th Cir. 2010) (noting that a

person who knows the limits of an agent's authority cannot hold a principal liable for

representations made by the agent outside of his authority).  Viewing the evidence in a

light most favorable to Ms. Sierra, the Court finds that a jury could reasonably conclude

that Ms. Arguello had apparent authority to bind Stonebridge to an insurance contract

given that Ms. Arguello had the authority to represent the terms, scope, and effective

dates of an insurance policy.[17]  *See Life Investors,* 833 P.2d at 868.  Assuming, as Ms.

Sierra claims, that Ms. Arguello told Ms. Sierra on July 2, 2007 that she was purchasing

a $100,000.00 life insurance policy for her husband, Docket No. 69-2 at 4 (Sierra Dep.

70:8-13), this representation may be binding on Stonebridge as the representation of an

insurance agent with apparent authority to act on Stonebridge's behalf.  *Life Investors,*

833 P.2d at 868.[18]

In addition, as noted above, Mr. Bennett's affidavit does not contradict Ms.

Sierra's testimony that she did not receive a copy of the July 2, 2007 policy.  Docket No.

54-11 at 5 (Sierra Dep. 18:9-18).  Assuming that Ms. Sierra did not receive a copy of

the July 2, 2007 policy, Ms. Sierra had no reason to believe that Ms. Arguello's alleged

representations during the July 2, 2007 phone call contradicted the terms of the

insurance policy Stonebridge issued.  *See Life Investors,* 833 P.2d at 868; *Branscum*,

984 P.2d at 680.  If a jury found that Ms. Sierra was not aware that Ms. Arguello's

alleged misrepresentations contradicted the express terms of the July 2, 2007

insurance policy, the jury could reasonably conclude that Ms. Sierra relied on Ms.

---

[17]To the extent Stonebridge disagrees with this finding, the Court notes that this also creates a genuine dispute of material fact because the question of whether an agent has authority to act on behalf of a principal is an issue of fact.  *Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo. App. 2004).

[18]Stonebridge cites cases standing for the proposition that an insurance binder – a temporary contract of insurance that protects the insured until issuance of a formal policy – is automatically extinguished upon the issuance of a formal policy by the insurer.  *See, e.g., Unigard Sec. Ins. Co. v. Mission Ins. Co. Trust*, 12 P.3d 296, 299-300 (Colo. App. 2000); *Chevron Oil Co. v. Indus. Comm'n*, 456 P.2d 735, 737-38 (Colo. 1969).  However, these cases are not persuasive since they do not discuss the issue presented here, namely, who bears the risk if an agent with apparent authority makes an erroneous representation to an insured in order to secure a policy and the insured never receives the actual written policy.

Arguello's representation that Ms. Sierra could buy a $100,000.00 life insurance policy for her husband. *Branscum*, 984 P.2d at 680. Thus, although Stonebridge claims that the actual terms of the issued policy should govern, the Court finds that there are genuine disputes of material fact regarding whether Ms. Arguello had the authority to bind Stonebridge to an insurance contract and, if so, whether Ms. Arguello's alleged statements to Ms. Sierra on July 2, 2007 in fact do so.[19] *See Myers*, 371 F. App'x at 956.

Fourth, Stonebridge argues that the July 2, 2007 phone call could not have resulted in a life insurance policy for $100,000.00 because the transcript of the phone call does not mention coverage for $100,000.00. Docket No. 78 at 12-13. The Court disagrees. The fact that the July 2, 2007 transcript does not mention that the policy purchased is for $100,000.00 is not conclusive. Stonebridge has not shown that its licensed insurance agents always recite the policy limits of the insurance coverage purchased during telephone calls. For example, the transcript of the August 2, 2007 phone call does not identify the policy limits for the coverage Ms. Sierra purchased, *see* Docket No. 69-1 at 13, yet it is undisputed that the August 2, 2007 policy provided for $1,000,000.00 in insurance benefits for accidents involving common carriers.[20] Docket

---

[19]In addition, the Court finds that Stonebridge's reference to the 1998 policy is inapposite. *See* Docket No. 85-2. Ms. Sierra claims that she did not receive the July 2, 2007 policy and, therefore, had no reason to believe that Ms. Arguello changed or waived the terms of the written policy during the July 2, 2007 phone call.

[20]The August 2, 2007 transcript supports Ms. Sierra's argument that Stonebridge's licensed insurance agents do not always repeat all of the terms of an insurance policy during the recorded portion of phone calls between insurance agents and potential customers.

No. 54-17 at 2-3; Docket No. 78 at 12; Docket No. 69-1 at 13.  In addition, although Stonebridge argues that Ms. Sierra's conversation with Ms. Arguello was a preliminary negotiation, docket No. 78 at 13-14, the Court finds that the legal effect of the conversation between Ms. Sierra and Ms. Arguello raises a genuine dispute of fact for the jury to determine.  *I.M.A.*, 713 P.2d at 887-88.  Accordingly, the fact that the July 2, 2007 transcript does not identify a $100,000.00 insurance policy is inapposite.

In conclusion, Ms. Sierra has presented enough evidence to establish a genuine dispute of material fact regarding whether there was an agreement about the essential terms during the July 2, 2007 phone call creating a life insurance policy for $100,000.00 for her husband.  Because there are genuine disputes of material fact, the Court will deny Stonebridge's motion for summary judgment with regard to the July 2, 2007 phone call.[21]

### 2.   *August 2, 2007 Phone Call*

Ms. Sierra argues that the transcript of the August 2, 2007 phone call demonstrates that two phone calls occurred on this day, yet Stonebridge only provided the transcript for the afternoon phone call.  *See*  Docket No. 69-1 at 12-14.  Ms. Sierra contends that the missing transcript of the conversation that occurred on August 2, 2007 proves two things: first, it shows that Ms. Sierra could have agreed to purchase a $100,000.00 life insurance policy for her husband during the phone call that occurred

---

[21] Although Ms. Sanchez testified that, in 2009, a Stonebridge representative confirmed that Ms. Sierra had a life insurance policy of $100,000.00, Docket No. 69-3 at 3 (Sanchez Dep. 11:5-9), the Court finds that this evidence does not establish coverage for Ms. Sierra's husband.  Assuming Ms. Sanchez's statement is true, this evidence shows that Ms. Sierra purchased two $100,000.00 life insurance policies on behalf of herself, and not her husband.

on the morning of August 2, 2007; and, second, that the August 2, 2007 phone call is a

continuation of the July 2, 2007 phone call in that this conversation completed the terms

of the $100,000.00 life insurance policy she purchased for her husband on July 2,

2007. *See* Docket No. 69 at 9-10 ("this oral agreement . . . which was finalized on

[August 2, 2007] is the last conversation about insurance, which according to

Defendant effectively trumps the transcription of the conversation on July 2, 2007").

The Court disagrees.

The transcript of the August 2, 2007 phone call clearly shows that, during this

call, Ms. Sierra purchased an "accidental death and hospital confinement" policy and

not a life insurance policy for her husband. *See* Docket No. 69-1 at 13. In addition, the

monthly premium associated with the policy purchased on August 2, 2007 is $21.95,

*id.*, which is not the same amount Ms. Sierra testified was associated with the July 2,

2007 policy she claims she bought for her husband. *See* Docket No. 69-2 at 3 (Sierra

Dep. 69:3-12). Moreover, the $21.95 monthly premium is consistent with the premium

Mr. Johnson identified in connection with the accidental death policy. *See* Docket No.

54-17 at 2-3. Thus, because the evidence in the record shows that the August 2, 2007

phone call between Ms. Sierra and Ms. Acosta created a contract for accidental death

and hospital confinement coverage, and not a $100,000.00 life insurance policy for her

husband, *see* Docket No. 69-1 at 13, Ms. Sierra does not raise a genuine dispute of

material fact with regard to the August 2, 2007 phone call.[22] Therefore, the Court finds

---

[22]The Court notes that Ms. Sierra's argument regarding the August 2, 2007
phone is not based on Ms. Sierra's deposition, her affidavit, or any other evidence
provided by Ms. Sierra. *See* Docket No. 69 at 9-10. As such, the argument about the
August 2, 2007 phone call is not supported by admissible evidence. However, in

that Stonebridge is entitled to summary judgment on its argument that the August 2, 2007 phone call did not create a $100,000.00 life insurance policy.

### 3.   *January 15, 2008 Phone Call*

With regard to the January 15, 2008 phone call, it is undisputed that Mr. Ohrner presented Ms. Sierra with an offer to purchase a life insurance policy with $11,683.00 in coverage benefits.  *See* Docket No. 54-4 at 8 (0578).  In addition, Mr. Ohrner notified Ms. Sierra about the various limitations and exceptions to coverage.  Docket No. 54-4 at 9 (0579).  After listening to Mr. Ohrner's offer, Ms. Sierra agreed to purchase the insurance policy for $24.95 per month.  *See id.* at 10 (0580).  Based on these undisputed facts, the Court finds that the January 15, 2008 phone conversation between Mr. Ohrner and Ms. Sierra created a valid and enforceable contract for an insurance policy providing $11,683.00 in life insurance benefits.  *See Sumerel*, 232 P.3d at 133; *Indus. Prods. Int'l, Inc.*, 962 P.2d at 988.  Ms. Sierra assented to all essential terms of the contract when she agreed to pay $24.95 per month in exchange

---

responding to a motion for summary judgment, a non-movant must provide evidence in the form of affidavits, depositions, or other documents to show that a fact is genuinely disputed.  Fed. R. Civ. P. 56(c); *State Farm Mut. Auto. Ins. Co. v. Fisher*, 618 F.3d 1103, 1106 (10th Cir. 2010).  Moreover, Ms. Sierra argues that she is entitled to an adverse inference because defendant did not provide a transcript of the conversation that occurred on the morning of August 2, 2007.  *See* Docket No. 69 at 10.  However, it is undisputed that defendant only records conversations that occur between customers and licensed insurance agents.  *See* Docket No. 54-3 at 1, ¶¶ 6-7.  Ms. Sierra, however, does not present any admissible evidence showing that she spoke with a licensed insurance agent on the morning of August 2, 2007.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (noting that facts in support of summary judgment "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein").  Thus, Ms. Sierra is not entitled to a negative inference because she does not establish that the conversation that occurred on the morning of August 2, 2007 was between herself and a licensed insurance agent.

for coverage in the amount of $11,683.00 and there is no indication from the record that the parties did not intend to be bound until Ms. Sierra received the insurance certificate in the mail.  *See DiFrancesco*, 39 P.3d at 1248 (noting that, when a verbal understanding is "expressly made 'subject to' preparation of a written document, it is reasonable to infer that the parties have not yet agreed to be bound").  To the extent Ms. Sierra argues that the January 15, 2008 phone call created some other agreement, she presents no evidence to rebut the undisputed evidence in the record.  *See.* Fed. R. Civ. P. 56(c).  Accordingly, the Court finds that Stonebridge is entitled to summary judgment on its argument that the January 15, 2008 phone call did not create a $100,000.00 life insurance policy for her husband.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Stonebridge's Motion for Summary Judgment [Docket No. 54] is **GRANTED** in part and **DENIED** in part as indicated in this Order.

DATED September 23, 2013.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge